202 July 1, 2026 No. 620

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of R. A. K.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

R. A. K.,
*Appellant.*

Clackamas County Circuit Court
21JU05778; A181900

Colleen F. Gilmartin, Judge pro tempore.

Argued and submitted March 7, 2025.

Erica Hayne Friedman argued the cause for appellant. Also on the brief was Youth, Rights & Justice.

Jennifer S. Lloyd argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

**PAGÁN, J.**

Youth appeals a judgment placing him on probation under supervision of the Juvenile Department after adjudicating him for acts that, if he were an adult, would constitute second-degree manslaughter and reckless driving.[1] Youth asserts four assignments of error, claiming that the juvenile court erred by (1) adjudicating youth for acts that, if committed by an adult, would constitute manslaughter in the second degree, ORS 163.125, (2) adjudicating youth for acts that, if committed by an adult, would constitute reckless driving, ORS 811.140, (3) determining that youth was responsible for acts that, if committed by an adult, would constitute criminally negligent homicide, ORS 163.145, and (4) making factually inconsistent findings that youth had both a negligent and reckless mental state. Youth also requests *de novo* review. We decline to review *de novo* and conclude that there was sufficient evidence for the juvenile court's rulings and that the juvenile court did not make factually inconsistent findings. We affirm.

## I.   BACKGROUND

Because youth challenges the sufficiency of the evidence to support the juvenile court's conclusion that he was responsible for acts that, if he were an adult, would constitute second-degree manslaughter, reckless driving, and criminally negligent homicide, we view the evidence "in the light most favorable to the state" and will uphold the juvenile court's conclusions if "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. J. C. L.*, 261 Or App 692, 700, 325 P3d 740 (2014). We present the facts according to that standard.

The vehicle collision at the center of this case occurred on November 19, 2021, when youth left his home to drive to school along a rural, two-lane highway. Youth was 17 years old at the time of the incident, had been a licensed driver for several months, and had had a learner's permit for sixth months prior. It was undisputed that the driving conditions were very poor: it was a dark, mid-November

---

[1] The juvenile court also concluded youth was responsible for acts that, if committed by an adult, would constitute criminally negligent homicide, but merged that count into second-degree manslaughter.

morning only a few minutes after sunrise, it was raining heavily, there was standing water on the road, and cars were kicking up large sprays of water as they drove. As youth was driving, he came up behind another car, driven by P, that was driving below the 55 miles per hour speed limit. Youth thought that P was driving more slowly than necessary, and several times came up close behind her before backing off. P testified that she slowed going into a turn with a 30 miles per hour advisory speed and started to accelerate out of the turn into a straightaway, which had a passing zone. As she did so, she noticed that youth had pulled out into the oncoming lane to pass her and she started to slow down. At this time, M, the victim, was approaching while driving a car in the other direction. Experts at trial stated that youth could have slowed down and pulled back in behind P. Instead, when youth was at about even with the back wheel of P's car, he "punched it," accelerating from about 55 miles per hour to about 75 miles per hour in the five seconds before the collision in an attempt to complete the pass. Youth and M had a head-on collision that killed M and injured the two passengers in M's car. Youth was also injured. Emergency services arrived shortly after. Youth told a responding officer at the hospital that he remembered accelerating out of the corner and then waking up in his vehicle on its side, but did not have any memory of trying to pass P.

During a follow-up interview, youth told the investigating detective that he still had no memory of passing P and did not think he would have tried to pass, stating that he knew that he should not try to pass another car when there were oncoming headlights because it could "go wrong so fast."

When the court made its oral findings and rulings, youth's mental state was the key issue in the case. The court first addressed the charge of criminally negligent homicide because it had the lesser mental state: criminal negligence, an objective standard. The court compared youth's conduct to that of a "reasonable person" in youth's situation and concluded that youth's decision to try to pass P was a gross deviation from what a reasonable person would do. The court then turned to the reckless mental state required for

second-degree manslaughter and reckless driving. The court restated that youth's conduct was a gross deviation from what a reasonable person would have done, then found that youth had been aware of the substantial and unjustifiable risk and had consciously disregarded that risk. Judgment was entered for the adjudications of second-degree manslaughter, and reckless driving. Criminally negligent homicide was merged into second-degree manslaughter. Youth timely appealed**.**

## II.   ANALYSIS

A.   *Sufficiency of the Evidence*

In his first three assignments of error, youth challenges the sufficiency of the evidence for the juvenile court's conclusions that he was responsible for acts that, if committed by an adult, would have amounted to second-degree manslaughter, reckless driving, and criminally negligent homicide. Youth specifically claims that the state failed to prove that youth had the necessary mental states for the offenses. We address those three assignments together because they rely on the same evidence and have the same standard of review. Because we conclude that there was sufficient evidence that youth was reckless, we affirm.

We will uphold the juvenile court's denial of youth's motion for judgment of acquittal if viewing the evidence "in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *J. C. L.,* 261 Or App at 700.

At the heart of youth's first three assignments of error is the question of whether youth's conduct that resulted in the collision and the death of M was reckless.[2] Recklessness is defined as follows:

> "'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of

---

[2] While criminally negligent homicide does not *require* proof of recklessness, proof of a reckless mental state will serve to establish criminal negligence. ORS 161.115(3).

such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9). Because recklessness requires that youth was aware of the risk, "our inquiry must focus on [youth's] actual perceptions at the time * * *." *State v. Stuart*, 283 Or App 672, 676, 389 P3d 1157 (2017). Those perceptions are subjective, and "will rarely be susceptible to direct proof; [they] must be inferred (or not) from objective facts." *Id.* at 676-77.

Here, there was sufficient evidence to support the juvenile court's determination that youth was reckless. The recklessness analysis can be broken into three parts: establishing that youth was aware of the substantial and unjustifiable risk resulting from his conduct, that such conduct was a gross deviation from what a reasonable person would do, and that youth consciously disregarded the risk. *See* ORS 161.085(9).

When viewed in the light most favorable to the state, a rational factfinder could conclude that the evidence supports the determination that youth was aware that trying to pass another car under then-existing conditions carried with it a substantial and unjustifiable risk of the kind of collision that followed. In his interview with one of the investigating detectives, youth stated, "I still don't remember how I crashed. I don't remember passing. *I don't think I would,*" (emphasis added), and explained that he did not think he was trying to pass the car because "[i]t [did not] seem smart for me to do it," and told the officer, "I have never passed a car with oncoming headlights in the distance before, because I know it can go wrong so fast." Additionally, the data from youth's car showed youth accelerating to around 75 miles per hour right before the crash, which can also support the inference that youth was aware that the situation was dangerous but tried to complete the pass anyway instead of falling back.

Next, the circumstances surrounding the incident, most notably the poor driving conditions, could also lead a rational factfinder to determine that youth's conduct was a gross deviation from standard of care a reasonable person

would have used. It was a mid-November morning, only a few minutes after sunrise, it was raining heavily, there was standing water on the roadway, and the car in front of him was kicking up a spray of water that required youth to have his windshield wipers going full speed. Additionally, expert testimony opined that based on the positions of the cars, youth would have had time to slow down and fall back behind the other car upon seeing the oncoming headlights. Instead, he sped up and tried to complete the pass. That evidence was sufficient to allow a rational factfinder to determine that youth's attempt to complete the pass despite the bad weather, visible oncoming headlights, and time to slow down and fall back behind the other car was a gross deviation from the standard of care a reasonable person would have used in those circumstances.

Lastly, the evidence that youth, instead of falling back, decided to rapidly accelerate to attempt to complete the pass supports the inference that youth consciously disregarded the risk of a collision with the oncoming car. Evidence from youth's car's air bag control module and testimony from P established that during the five seconds immediately preceding the collision, youth tried to "punch it," going from a speed of around 55 to 75 miles per hour. The rapid acceleration can support the inference that youth saw the oncoming car, realized that there was a substantial risk of collision in trying to pass, but tried to complete the pass anyway, "punching it" in order to try to pass faster.

In contrast, youth argues that the evidence cannot support the inference that youth's decision to speed up showed a disregard for a substantial and unjustifiable risk, but actually showed that he desired avoiding a head-on collision; that youth's conduct did not rise to a "gross" deviation from what a reasonably careful person would do; and that youth, even if he generally knew the risks of passing and driving in poor conditions, did not know that he did not have time to complete *this* pass. We find youth's arguments unpersuasive.

Youth's first two arguments amount to asking us to make different inferences and interpretations based on the evidence than the juvenile court did. However, as discussed

above, the evidence sufficiently supported the inferences and interpretations of the juvenile court, and the fact that the evidence may have reasonably supported other conclusions does not render the evidence insufficient.

To support his last argument, that the evidence was not sufficient to support the inference that youth actually perceived the risk of collision in the moment, youth compares his case to *State v. S. N. R.*, 260 Or App 728, 320 P3d 569 (2014). In that case, we reversed the youth's adjudication of negligent homicide because we concluded that while the youth knew the dangers of driving while tired, the evidence did not establish that she was aware that she was too tired in the moment to make it to the next pull-off. *Id.* at 738. But this case is distinguishable from *S. N. R.*, in which the driver dozed off while driving and drifted into the oncoming lane. *Id.* at 729. Here in contrast, youth took action ("punching it") that showed that he was aware that he was in a dangerous situation—passing when there was an oncoming car—but still took action that further exacerbated the risk of a collision. Thus, the evidence can support the inference that youth was aware of the risks of making the specific pass at issue here.

Having established that there was sufficient evidence to support the determination that youth engaged in reckless conduct, we can conclude that there was sufficient evidence that youth was responsible for all three offenses because youth only challenges the sufficiency of the evidence regarding his mental state. Recklessness establishes the required mental state for second-degree manslaughter, reckless driving, and negligent homicide.

B.  *Conflicting Factual Findings*

Youth's final assignment of error is that the juvenile court's factual findings are logically incompatible because the court found in separate analyses that he had both a negligent mental state and a reckless mental state, and thus either *de novo* review or reversal is necessary to find consistent facts. We are unpersuaded by this argument because the court's findings are not inconsistent in the context of its analysis.

In its oral findings, the court laid out a roadmap of its analysis, stating that it was "going to start with Count 2, which is Criminally Negligent Homicide, and the reason [it was] doing that [was] because * * * each of the charges before the Court [came] with a required mental state" and criminally negligent homicide had the lesser of the two mental states. It framed the legal question it was answering as, "in [youth's] circumstance what would a reasonable person do? And if the individual did not act like a reasonable person, is that a—not just a deviation, but a gross deviation?" In other words, the court focused on comparing youth's conduct to a reasonable person's (an objective test) and did not find that youth was subjectively unaware of the risk. In fact, contrary to youth's assertion, the court *did* find that youth understood the possibility of a substantial risk when it was analyzing whether youth had a criminally negligent mental state, but it did not expand upon that analysis until it was relevant in its later discussion of the reckless mental state. When it undertook its analysis of second degree manslaughter, the court opened by framing the legal question of mental state, stating, "Recklessness requires not just that an individual knew of a substantial risk, *which I have found existed here*, but that the person knew it existed and then disregard[ed it]." Thus, youth's claim that the court's reasoning was logically untenable is unpersuasive in light of the court's oral findings and conclusions.

Affirmed.